UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

HAROLD FREE #602459                    CIVIL ACTION NO. 21-cv-1642

VERSUS                                 JUDGE S. MAURICE HICKS, JR.

JEFF LANDRY                            MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury, by a 10-2 vote, convicted Harold Free ("Petitioner") of the second-degree murder of his 21-year-old stepson. Petitioner received a mandatory life sentence. His conviction was affirmed on appeal. State v. Free, 127 So.3d 956 (La. App. 2d Cir. 2013), writ denied, 140 So.3d 1174 and 148 So.3d 944 (La. 2014). He then pursued two applications for post-conviction relief in state court. Petitioner now seeks federal habeas corpus relief based on claims of prosecutorial misconduct, ineffective assistance of trial and appellate counsel, and Louisiana's (then) lack of a unanimous verdict requirement. For the reasons that follow, it is recommended that the petition be denied.

### Background Facts

Petitioner met Kathy, his wife, in 1996, when her son T.J. was about eight years old. Petitioner and Kathy married in 2008. Petitioner testified that he "totally disliked" T.J. within weeks of meeting him and admitted that he "hated" the young man. T.J. had ADHD and dyslexia, had about a sixth-grade education, worked only sporadically, and had a history of drug abuse. Petitioner testified that T.J. had dragged his mother down the hall

by her hair, gone to jail for hitting Petitioner with a chair, choked the mother of his child, been banned from their trailer park and Kathy's workplace, and was not welcome to stay with any of his relatives.

Petitioner and Kathy lived in a mobile home. T.J., after he became an adult, was generally not welcome there. He showed up in 2008 to hide from the police, and he and Petitioner got into a physical confrontation. Petitioner tackled T.J. and held him until police arrived. The incident that led to T.J. going to jail happened in 2010 when he showed up to ask for money, when he knew he was not welcome. Petitioner told him to leave and threw a plastic patio chair at him. The two men threw the chair back and forth at each other, with Petitioner getting the worst of it. T.J. was arrested, pled guilty to two counts of misdemeanor battery, and served about six months in jail. Petitioner said that he and Kathy never fought and were quite happy during that time.

T.J. was released on probation about two weeks before his final altercation with Petitioner. Petitioner had softened and agreed to let T.J. stay with them and to help him get his life together. On the morning of the shooting, Petitioner helped the barely literate T.J. obtain a driver's license for the first time, but an argument broke out when Petitioner told T.J. that he could not drive Petitioner's company truck or Kathy's car. Petitioner testified that T.J. threatened his life five times that day. Petitioner and T.J. met Kathy for lunch, and T.J. gobbled his food sloppily "like a dog" and yelled repeatedly for employees to bring him more cokes. Petitioner would not let T.J. get back in his truck, so Kathy took him to work with her that afternoon.

Petitioner then went to the coroner's office to ask about having T.J. committed. He described T.J. as a drunken, suicidal drug addict. An employee at the coroner's office testified that she concluded T.J. was committable, but she did not write the commitment order because Petitioner told her that he and his wife wanted to find out from the D.A. if T.J.'s early release from jail could be revoked. Petitioner said that the revocation could lock T.J. up for 90 days instead of the three days under a commitment. Petitioner left the office, but he returned later and told the woman who assisted him that he would "take care of it" himself.

While at the coroner's office, Petitioner encountered Ronald Carraway, a family acquaintance, who testified that Petitioner was aggravated and mad. Petitioner told Carraway that the authorities would not commit T.J., so he would "take care of it" himself. Petitioner told Carraway that all T.J. needed was a "bullet in the head and a body bag," and Mr. Carraway testified that he had heard Petitioner use that expression about T.J. several times in the past. Petitioner admitted that he make the comment, but said it was just "off the cuff" and something he said about other people or animals that caused problems.

Petitioner was a "repo man" and routinely carried a .22 Magnum derringer that he bought several years earlier and had fired only a few times the weekend after the purchase. He inherited an old .38 revolver in 1979 and last fired it at that time. He had never bought fresh bullets for the revolver, but at about 5:30 p.m. on the day of the shooting he went to Walmart, bought fresh bullets, and reloaded the gun with the new bullets when he got home. He said that he replaced the old bullets after a friend told him a story about someone

firing old bullets that were not effective. He had not been carrying the derringer that day, but he armed himself with it as well.

That evening, T.J. was in his bedroom, and Petitioner and Kathy watched television and drank vodka and grapefruit juice. Petitioner had said that T.J. could stay the night only if he stayed in his room and kept quiet. Kathy testified that at about 8:00 p.m. Petitioner (6' and 230 pounds) told her that if she did not take T.J. (5'8" and 141 pounds) to work with her in the morning, he was going to have his son (5'11" and 300 pounds) come over. He threatened that one of them would hold T.J. down and the other would "black" both of his eyes and knock out some of his teeth before throwing him out. At one point during the evening, Petitioner got in Kathy's face and told her that he hated her as much as "that little son of a bitch in that front bedroom" and that he would have her out in two days.

Kathy went to the master bedroom at about 10:00 p.m. and called her daughter for a daily chat. Petitioner came into the bedroom carrying the .38 revolver and told Kathy that she had better come see about her son. He said that T.J. had come out of his room to get a snack and told Petitioner that he wished Petitioner's brother would die. (The brother testified that he had suffered a stroke.) Kathy's daughter told her mother to hang up and call 911, which she did. The 911 recording was not submitted to this court, but the state appellate court quoted much of the transcript and noted that some of the dialogue is inaudible or difficult to understand.

Kathy testified that Petitioner and T.J. began exchanging vulgarities. Petitioner was armed with both handguns. T.J. was unarmed, barefoot, and wearing only shorts. Kathy and T.J. told Petitioner to put the guns down, but he refused. Kathy testified that,

immediately before the shooting, she was walking T.J. to his bedroom when Petitioner said, "T.J., turn around; I have something for you."  She and T.J. turned around, and Petitioner fired a single shot from the derringer that struck T.J. between the eyes.  He immediately collapsed, and he later died at the hospital after he was taken off a ventilator. Kathy testified that she screamed at Petitioner, who said he would say T.J. was a burglar. The 911 recording captured such things as Petitioner shouting, "I'll kill you dead, boy!" T.J. said, "Get the gun out of my goddamn face," and Kathy said, "You can't shoot somebody in your house," and, "He's not a burglar!"  A loud gunshot can be heard, and Kathy screamed, "He ain't got no gun!"

After the shooting, Petitioner went into the bedroom and called 911.  He repeatedly asked the operator to help him and said that he thought he hit T.J. in the stomach.  He requested an ambulance, but he did not attempt to give first aid.  He did go outside to direct first responders to the house.  Petitioner testified at trial that T.J., who was about 18 feet away from him, was aggressively trying to get at him, but Kathy blocked T.J. with a door until T.J. got passed it and took "one or two" steps toward Petitioner, who fired to stop T.J. from attacking him.  Petitioner said that he was not a marksman and agreed with a statement that it was a "fluke" that he hit T.J. between the eyes.

**State Law Errors**

Petitioner's several claims argue that the actions of the prosecutor and other events at trial amount to violations of both Louisiana law and the federal constitution.  The court will not address any of his state law claims because habeas relief may be granted to a state prisoner only on the ground that he is in custody in violation of the constitution or laws of

the United States. 28 U.S.C. § 2254(a). The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011).

**Prosecutorial Misconduct**

### A. State Court Proceedings

This case was prosecuted by ADA Dale Cox, and Petitioner was defended by Richard Goorley and Ross Owen, all of whom are very experienced trial lawyers. Petitioner argues that ADA Cox committed unconstitutional misconduct in his opening statement, questioning of witnesses, and closing argument. The State admits that Petitioner exhausted his state court remedies with respect to this claim by virtue of his first post-conviction application. Judge Ramona Emanuel issued a short opinion that listed the post-conviction claims, identified the briefs filed in connection with the application, and concluded without analysis: "As noted, this Court finds that all claims lack no merit (sic) and are hereby denied." Tr. 2107-09. The state appellate court issued an order that acknowledged the filing of an application for supervisory review and concluded: "On the showing made, this writ is hereby denied." Tr. 2338. The Supreme Court of Louisiana denied a writ application with a per curiam that said Petitioner failed to show that he received ineffective assistance of counsel under the standard of Strickland and, "[a]s to his remaining claims, applicant fails to satisfy his post-conviction burden of proof. La. C. Cr. P. art 930.2." Tr. 2739-41. Article 930.2 states that a petitioner for post-conviction relief has the burden of proving that relief should be granted.

### B.  Applicable Law; Habeas Burden

Prosecutorial misconduct does not provide a basis for habeas relief unless it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 106 S.Ct. 2464, 2471 (1986).  A prosecutor's comments will only render a trial unfair where the improper argument was "a crucial, critical, highly significant factor in the jury's determination of guilt." Whittington v Estelle, 704 F.2d 1418, 1422 (5th Cir. 1983). The petitioner must also demonstrate prejudice by showing that the misconduct was so persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks. Geiger v. Cain, 540 F.3d 303, 308 (5th Cir. 2008); Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988).

The state court denied Petitioner's prosecutorial misconduct claims on the merits, so habeas relief is available only if the state court's adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts. Williams v. Taylor, 120 S.Ct. 1495, 1519-20 (2000).  A state court makes an unreasonable application of clearly established federal law when it identifies the

correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable.  Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

The decisions issued by the state courts contained little or no analysis, but "Section 2254(d) applies even where there has been a summary denial."  Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (2011).  A petitioner who challenges a state court's summary denial may meet his burden under the first prong of Section 2254(d) only by showing that there was "no reasonable basis" for the state court's decision.  The federal habeas court must determine what arguments or theories could have supported the summary decision, and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  Pinholster, 131 S.Ct. at 1402, citing Harrington v. Richter, 131 S.Ct. 770, 786 (2011).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Richter, quoting Yarborough v. Alvarado, 124 S.Ct. 2140 (2004).

## C.  Analysis

Petitioner first complains that ADA Cox "lied to the jury" in his opening statement when he said that Petitioner "took a shooter's stance … extended his arms directly out [and said] turn around T.J.; I've got something for you."  Petitioner argues that the State presented no evidence of a shooter's stance and that the 911 recording proves that he never made the "turn around" statement.  However, Kathy testified that she was walking T.J. to his bedroom when Petitioner "said, T.J., turn around; I have something for you."  She said

that Petitioner "was standing there at the end of the love seat with the gun pointed, already had it aimed. And he shot." She demonstrated how Petitioner had his hands extended in front of him before he fired. Tr. 912-13. Petitioner contends that Kathy's testimony was false because the 911 recordings do not include his statement, but the state appellate court noted: "Some of the dialogue is inaudible and portions of the tape are difficult to understand." State v. Free, 127 So.3d at 964. The prosecutor was free to make an opening statement based on Kathy's anticipated testimony about the events, even if a particular statement was not clearly captured on the recording.

Police officers testified that Petitioner appeared to be in a state of shock when they arrived after the shooting. ADA Cox told the jury that Petitioner "showed no real emotion" when police arrived. Petitioner argues that this was inappropriate, but an attorney "may recite to the jury those inferences and conclusions he wishes them to draw from the evidence so long as they are based on the evidence." U.S. v. Delgado, 672 F.3d 320, 336 (5th Cir. 2012). His assertion of "what he believes the evidence will show and has shown is not error" and does not constitute improper argument." Ortega v. McCotter, 808 F.2d 406, 410 (5th Cir. 1987). Also, "unflattering characterizations of a defendant will not provoke a reversal when the descriptions are supported by the evidence." Delgado, quoting U.S. v. Windom, 510 F.2d 989, 994 (5th Cir. 1975) (no error in prosecutor's reference to defendant as a "con artist"). It was reasonable for the prosecutor to argue that Petitioner showed no emotion, and the defense could have fairly responded that it was due to being in shock.

Petitioner argues that ADA Cox lied when he said that Kathy opened the front door to the trailer to keep her son protected from her husband. He points to a detective's report that said Kathy had the door open blocking Petitioner from coming into the living room. But Kathy testified that she was trying to get T.J. to go to his room and she "had my hand on the door so T.J. would kind of be safe in the hallway" but Petitioner pushed her out the door and called her a whore. Tr. 911. There was competing evidence regarding the events around the door, and Cox was free to urge his interpretation of that evidence.

Petitioner complains that Cox tainted the jury with speculation about Petitioner's skill as a marksman. Cox described how the small .22 Magnum "is not an accurate weapon at great distances" so that for Petitioner to shoot the boy between the eyes at that distance meant that he was a "very, very good shot" and that he had a very steady hand. Petitioner argues that this was improper personal opinion that had no place in an opening statement, but it appears to be a reasonable conclusion that Cox would wish the jury to draw from the evidence that would be presented at trial. Anyone familiar with the firearm at issue would know that to hit a target at any appreciable distance requires either great skill or great luck. Petitioner was able to fairly respond when he testified in detail about his lack of shooting experience with his guns. There is no basis for habeas relief on this argument.

Cox argued that Petitioner did not have T.J. committed or call the police to remove him from the home because Petitioner intended to kill T.J. Petitioner characterizes this as a lie because Kathy talked him into allowing T.J. to stay at the residence one more night. The argument was nonetheless a reasonable interpretation of the evidence. The evidence often allows for more than one reasonable interpretation, and a prosecutor is not confined

to making only the arguments that most favor the defense. Petitioner raises similar objections to the prosecutor's description of the relative size of Petitioner and the victim, references to the victim as a "young boy who's dead now," and asking whether the funeral was an open or closed casket when the same question had been answered earlier in the trial. None of those arguments warrant discussion beyond saying that they do not rise to the level of prosecutorial misconduct that might warrant habeas relief.

Petitioner complains that the prosecutor mistreated him during cross-examination. For example, he "belittled" Petitioner's testimony that he "got two scars for the rest of my life, sir" after T.J. hit him with a chair in a prior incident. The prosecutor responded, "Oh. Two scars for the rest of your life?" Defense counsel objected, and it was immediately sustained. Petitioner labels as harassment repeated questions about whether Petitioner ever told T.J. that he (Petitioner) was disabled. There was some confusion about what was being asked, and the prosecutor appears to have repeated the question in a manner that drew a defense objection that he was prefacing his questions with editorial remarks. Petitioner also complains that when he answered Cox's question about an event at the coroner's office with, "Yes, for two reasons," Cox did not want to allow Petitioner to explain those reasons. After an objection, Cox agreed to "go back and start over, because I want you to be able to give an explanation."

Petitioner also points to cross-examination about whether he intended to kill T.J. or inflict great bodily harm when he fired the pistol, one of which must be proven to establish second-degree murder. Petitioner first said that he did not mean to hit him in the head and that he was scared. The prosecutor kept asking if Petitioner intended to do great bodily

harm.  After explaining why he was trying to protect himself and the like, the court instructed Petitioner to listen to the question and respond.  The prosecutor asked, "When you fired that shot, did you intend to do great bodily harm to T.J.?"  Petitioner answered, "Yes."  Petitioner complains that Cox harassed him into conceding to an essential element of the charged offense, but the question asked was a fair one, and Petitioner was not forced to give any particular answer.  A similar exchange happened when Petitioner was asked if he hated T.J.  Petitioner at first waffled and said that T.J. hated Petitioner, but Cox was dogged, and the court directed Petitioner to respond to the question, "Did you hate him?"  The answer, "Yes."  There was nothing constitutionally inappropriate about this line of questioning or the manner in which it was conducted.

Petitioner faults Cox for a rebuttal closing argument that pointed out that the ADA takes an oath to uphold the constitution, whereas defense counsel takes no such oath and is there to represent the defendant.  For context, one has to go back to the prosecutor's first phase of the closing argument when he was describing all the reasons that Petitioner should not have been physically afraid of T.J.  He mentioned how Petitioner had wrestled the boy down on one occasion and, later, threw a chair at him.  Cox argued that if Petitioner was afraid, he would not merely throw a chair at him.  "Of all the things that gall me about this case, he throws the chair first and the young man gets put in jail for six months.  That's wrong, okay?"  Tr. 1369.  Defense counsel responded in his closing argument:

> Gee, how unfortunate it is that T.J. got convicted as an innocent man?  Well, you know who convicted him?  You know who convicted him?  It wasn't Harold Free.  The DA.  The DA's office convicted him.  They convicted him. … Now, I will grant this to Mr. Cox; just because they prosecute somebody doesn't mean that that person is not innocent.  They do prosecute innocent

> people. And you know what? They convict innocent people. And that's
> why we have you here, to make sure that does not happen.

Tr. 1377. In rebuttal, Cox made the statement that drew this habeas challenge. Cox said

that he was "particularly sensitive" to defense counsel's comment, unsupported by any

evidence in the record, that the DA prosecutes innocent people. He said:

> I take an oath when I become an assistant district attorney, and I took a
> separate oath when I became the first assistant district attorney. And the oath
> I take is that I will follow the Constitution and uphold the Constitution and
> that everything I do will see toward the end that justice be done. … They
> don't take an oath. They're here to represent the man. And I ask that you
> please reject this notion that we prosecute innocent people all the time.

Tr. 1394-95.

In <u>Darden</u>, the Supreme Court noted that the challenged argument was an invited

response triggered by a defense argument. The Court said that the invitation did not excuse

improper comments, but it had to be considered to "determine their effect on the trial as a

whole." <u>Darden</u>, 106 S.Ct. at 2472. The "oath" argument at issue in this case was in direct

response to a defense argument that the DA's office prosecutes innocent people. <u>Darden</u>

also took into consideration that the trial court instructed the jurors that their decision was

to be made on the basis of evidence alone, and that the arguments of counsel were not

evidence. <u>Id</u>. Judge Pitman instructed the jury in this case that: "The statements and

arguments made by the attorneys at any time during the trial are not evidence." He went

on to explain that the evidence consisted of the testimony of the witnesses as well as the

exhibits introduced into evidence. Tr. 1400.

Some would find Mr. Cox's argument objectionable or improper, but courts have

affirmed convictions and denied habeas petitions when similar arguments were made. <u>See</u>,

e.g., U.S. v. Arce, 997 F.2d 1123 (5th Cir. 1993) (conviction affirmed after prosecutor argued that he was not paid enough to try to prosecute people he did not believe guilty; the argument was a response to a defense suggestion that the government coached its witnesses); Lange v. Quarterman, 2009 WL 3007917 (S.D. Tex. 2009) (habeas petition denied when prosecutor argued that he took an oath to uphold justice while defense counsel was there to defend his client, but the comments were invited by defense argument that the prosecutors coached a witness into changing her statement); and Fowler v. Lumpkin, 2022 WL 12366027 (N.D. Tex. 2022) (habeas denied in case where prosecutor argued that he took an oath for justice and truth; evidence of guilt was overwhelming and the misconduct was not of the kind that would have produced an improper outcome when considering that context of the entire trial and that the argument was in response to defense argument that the prosecutor was upset with the petitioner's testimony); and Com. v. Perkins, 473 Pa. 116, 373 A.2d 1076 (Pa. 1977) (court did not approve of prosecutor's argument that he took an oath to support justice, but trial court did not abuse discretion when it denied mistrial; argument was in response to a defense attack on the prosecutor, and jury instructions were to decide based on the evidence and not such argument).

The state court denied this claim on the merits. State courts are presumed to "know and follow the law," and a petitioner has the burden of showing that "there was no reasonable basis for the state court to deny relief." Richter, 131 S.Ct. at 784. Taking into consideration the evidence of guilt, that the argument was invited to some extent by defense counsel's argument that the DA prosecutes the innocent, that this was a peripheral issue in a case where the arguments otherwise focused on the testimony and evidence, and the

limiting instruction to the jury, fair-minded jurists could certainly disagree as to whether Petitioner's claim is inconsistent with the holding in <u>Darden</u> or any other holding of the Supreme Court. So long as there is room for such disagreement, the federal court must respect the state court decision and deny habeas relief.

Petitioner points to several other questions and arguments that he contends demonstrate prosecutorial misconduct. The ADA was undoubtedly aggressive and thorough, and he pushed the envelope at times. Trial judge Michael Pitman sustained objections on some of those occasions and chastised all counsel when exchanges were heated. In the end, neither the points discussed in this report and recommendation or otherwise urged in the petition amounted to a crucial, critical, or highly significant factor in the jury's determination of guilt. The trial was hard fought, by experienced attorneys on both sides, but it was sufficiently fair that the resulting conviction was not a denial of due process. The court has considered all of Petitioner's prosecutorial misconduct arguments and discussed the principal ones above. There is no basis to grant habeas relief on this category of claims under Section 2254(d), which "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." <u>Harrington</u>, 131 S.Ct. at 786.

**Ineffective Assistance of Counsel**

### A. Introduction

Petitioner argues that his attorneys rendered ineffective assistance of counsel in various ways. To prevail, Petitioner must establish both that (1) his counsel's performance fell below an objective standard of reasonableness and (2) had counsel performed

reasonably, there is a reasonable probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."  Id. at 2071.

### B. Habeas Burden

The state court denied Petitioner's Strickland claims in his post-conviction application, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007).  The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential."  Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009).  For the federal court to grant relief, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Woods v. Etherton, 136 S.Ct. 1149, 1151 (2016) (per curiam) (quotation marks removed).

### C.  Impeachment of Kathy

Kathy went to the police station a couple of hours after the shooting and gave a recorded statement.  Tr. 1985-2002.  She testified at trial on behalf of the State, and she was cross-examined by defense counsel.  Tr. 886-977.  Petitioner argues that defense counsel failed to impeach Kathy with each of several differences between her trial testimony, her statement to police, the 911 call recording, and the physical evidence.  A

review of the recorded interview and the trial testimony shows that Kathy was consistent in her description of the events.  There will always be small differences, and Petitioner has sought to point out every conceivable one, but the lack of such nitpicking by defense counsel does not make their cross-examination constitutionally deficient performance.

Petitioner first points to Kathy's statement to police that she was in the bedroom talking to her daughter on the phone when Petitioner entered the room with a gun in his hand and said, "You better come see about your son."  The police asked what T.J. was saying, and Kathy said she did not know what T.J. said because she "wasn't in there."  Tr. 1993-94.  At trial, Kathy testified that the master bedroom and living room were connected, and she could hear anything said in the living room or kitchen.  She testified that, when Petitioner came in her room, she had not heard any argument or talk at all between the two men.  She also testified that when Petitioner came to the bedroom, "[H]e told me that T.J. passed him going to the kitchen [and] said that he wished that [Petitioner's] brother Glen would die."  Kathy testified that she replied, "I said, No, I didn't hear T.J.'s voice."  Tr. 909.  Petitioner argues that this is somehow a great difference, and defense counsel should have used it to impeach Kathy.  Defense counsel did explore this issue with Kathy, and she was consistent that, although Petitioner may have thought T.J. made the comment about the brother, "I know T.J. didn't say it because I did not hear T.J.'s voice."  Tr. 969-70.

Kathy testified on direct that she tried to be a peacemaker and calm the two men, but Petitioner pushed her out the door and called her a whore.  Kathy said that, before the push, she had her hand on the door "so T.J. would kind of be safe in the hallway."  Tr. 911. Petitioner argues that defense counsel should have impeached Kathy with her statement to

the police that she "had the door of the trailer, you know, blocking my son there, and he, you know, [Petitioner] over here." Tr. 1988. Later, she told police that she tried to calm Petitioner down and "the next thing I know, you know, T.J.'s up, with the light on in the front bedroom, and I was, you know, trying to hold him back, you know." Tr. 1994. Petitioner argues that counsel should have used this material to show that Kathy was attempting to use the door to keep T.J. from getting to Petitioner. But it is not clear who she indicated she was trying to hold back, and Kathy immediately afterwards said that T.J. was not threatening Petitioner, but Petitioner was threatening repeatedly to kill T.J. Tr. 1995.

Kathy testified that she tried to be a peacemaker and had calmed the situation temporarily. Petitioner argues that counsel should have used the 911 recording to show that her description of the events was false because the recording reflected complete chaos with never a moment approaching quiet. Defense counsel questioned Kathy about the sequence of events, and the jury was allowed to listen to the entire 911 recording. Tr. 884. It also listened to the call that Petitioner made. Tr. 1325. Counsel was not remiss in addressing this concern.

Kathy testified that T.J. was standing in front of a dresser in the spare bedroom when he was shot. Petitioner argues that the location of the bloodstain from his head indicates that T.J. was actually standing in the hallway and fell backward into the room, which meant that he was closer to Petitioner than suggested. Defense counsel may not have asked about that particular point, but questions from both sides made clear Kathy's testimony that she and T.J. were going toward the bedroom and away from Petitioner when he called for T.J.

to turn around. There was also general agreement about where T.J. fell and that there was 18'6" between Petitioner and T.J when the fatal shot was fired.

Kathy told the police that, after Petitioner threatened to shoot T.J., T.J. mocked Petitioner by pointing his hand as if he also had a gun. Tr. 1996. Kathy testified at trial that T.J. did not make any threatening motions towards Petitioner, and Petitioner faults counsel for not exposing this contradiction. But counsel did ask Kathy if T.J. made such a hand motion. She initially denied it, but counsel presented her with her prior testimony at a pretrial hearing, and she was forced to concede, "I guess he did. I don't remember." Counsel continued to press her until she admitted that T.J. held up his fingers like a gun and pointed them towards Petitioner. Tr. 971-72.

Petitioner faults counsel for not cross-examining Kathy more meaningfully about matters such as when she hung up her phone call with her daughter and Kathy's testimony about her response to Petitioner's burglar remark. He contends that Kathy was inconsistent or that her testimony was not fully backed by the 911 recording. These are all minor points that, even if thoroughly explored, would have done nothing to undermine Kathy's credibility or the prosecution's case. Defense counsel conducted a reasonable and thorough cross-examination of Kathy, impeaching her on some important points, but they reasonably did not belabor all the relatively meaningless perceived discrepancies listed by Petitioner, which would have risked driving the jury insane or wrathful for wasting its time. The state court's denial of this claim on the merits was not an objectively unreasonable application of Strickland, so habeas relief is not permitted.

Page 19 of 32

### D.  Mary Nelson

The defense called Petitioner's sister, Mary Nelson, to testify about a phone conversation she had with Kathy soon after the shooting.  Mary testified outside the presence of the jury that Kathy told her that Kathy responded to Petitioner's yelling by trying to get T.J. to leave or go to his bedroom, but T.J. would not do it.  Mary testified that Kathy said Petitioner pushed her, and T.J. told him not to push his mother and "kind of went forward" and said, "I've got something for you."  Then "the gun went off and went right by her head."  Mary added that Kathy said T.J. was "coming toward" Petitioner.  The court sustained the State's hearsay objection and said that Mary's testimony could not be admitted as a prior inconsistent statement by Kathy because the defense did not lay a foundation by first asking Kathy if she made such a statement to Mary.  Tr. 1195-98. Accordingly, the jury did not hear Mary's testimony.

Petitioner argues that defense counsel's failure to ask Kathy if she ever told Mary what happened that night was ineffective assistance because it led to the exclusion of Mary's testimony.  It appears that counsel were remiss if they intended to call Mary as a witness, but reasonable minds could differ whether the lack of that question, in the heat of the trial, amounted to constitutionally deficient performance.  Even if it did, Petitioner would have to demonstrate prejudice.  Mary's testimony would have been of some benefit to the defense if she—the sister of the defendant—was found credible by the jury, but Strickland prejudice is present only when there is a reasonable probability that the verdict would have been different had Mary testified.

The state court denied this claim on the merits.  Whether that decision is contrary to or an unreasonable application of the holding in <u>Strickland</u> is at least debatable among reasonable jurists.  That there is room for such debate means that habeas relief is not permitted under the doubly deferential standard of Section 2254(d).

### E.  Larry Free

Defense counsel asked Kathy if she remembered telling Petitioner's brother, Larry Glen Free, that T.J. had threatened Petitioner and said something like, "I got something for you right now, you old MF," after which Petitioner pushed Kathy out of the way and fired once.  Kathy answered, "No."  Tr. 972-73.  The defense called Larry as a witness.

Larry, who said that he had previously suffered a stroke, testified that he went to the house that night and had a conversation with Kathy.  The State made a hearsay objection.  The jury was removed, and Larry gave testimony in the way of a proffer in support of the defense contention that it was admissible as a prior inconsistent statement by Kathy.  Larry testified that Kathy told him that the two men were arguing, Petitioner called Kathy to do something about her son, and she took T.J. back to his room, closed the door, and would not let him out.  Kathy allegedly said that T.J. reached out from behind the door, after promising Petitioner that he was going to kill him, and that is when Petitioner fired.  Defense counsel promptly excused Larry, abandoning the effort to have him testify before the jury.  Tr. 1191-94.

Petitioner argues that defense counsel was ineffective for not attempting to present Larry's testimony in support of the prior inconsistent statement argument.  Counsel obviously made a considered decision to abandon that tactic after hearing what Larry had

to say.  As would be expected, counsel did not explain their reasoning or strategy on the record, but they may have considered that Larry's testimony was not as damaging to Kathy's credibility as they expected.  Counsel might have also been concerned that Larry's testimony conflicted with even the description of events offered by Petitioner. Whatever the rationale, the decision was made after hearing what the witness would say and observing how he appeared on the stand.

Counsel must be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  Strickland, 104 S.Ct. at 2065-66.  Even the best attorneys would not defend a particular client in the same way, so a defendant must overcome the presumption that a choice by counsel might be considered sound trial strategy.  Id.  And considering the combined standards of review under Strickland and Section 2254(d), the question is not whether counsel's actions were reasonable but whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.  Blueford v. Hooper, 798 Fed. App'x 789, 792 (5th Cir. 2020), citing Richter, 131 S.Ct.  at 788.  There are reasonable arguments, as discussed above, that counsel satisfied that deferential standard, particularly given that the decision whether to call a witness is a matter of trial strategy on which counsel should not be second guessed. It is also debatable whether the verdict would have been different had Larry testified before the jury.  Accordingly, habeas relief is not permitted on this claim.

### F.  Failing to Prepare for Testimony

Petitioner argues that counsel failed to prepare him to testify, and the first time he was told he would testify was on the third day of trial when he took the stand.  He claims

that defense counsel gave him only two bits of advice: (1) tell the truth and (2) if they ask you what time it is, don't tell them how to fix a watch.  He contends that this failure to prepare him caused him to be alienated from the jury and to admit that he hated T.J. and intended to commit great bodily harm when he pulled the trigger.

The record does not support the claim.  The trial judge advised Petitioner that he had the right to testify or not testify and asked whether Petitioner had "discussed those options with your attorneys."  Petitioner answered, "Yes, I have, sir."  He then said that he would like to testify and that he had no questions about exercising that right.  Tr. 1206-07. Petitioner did not express any surprise about testifying or suggest a lack of preparation.

Review of a <u>Strickland</u> claim under Section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  <u>Pinholster</u>, 131 S.Ct. at 1398.  Petitioner offers only his conclusory assertion that he was not prepared by counsel. He cites nothing in the state court record to support his contention that counsel did not prepare him to testify, and what is in the record does not support the claim.  The state court's denial of this claim did not run afoul of the doubly deferential standard.

### G.  Failure to Object; Continued Relationship

Defense counsel attempted to cross-examine Kathy about the fact that she and Petitioner continued to be married and have a relationship after the shooting.  The prosecution objected to relevance.  Defense counsel argued that Kathy's credibility might be undermined if he could show that she continued to "lie with" the person who she claimed murdered her child.  The prosecutor responded that the line of questioning was character

assassination and an attempt to label Kathy as a "slut."  After extensive argument, the trial court sustained the relevance objection.  Tr. 962-67.

Appellate counsel argued that the trial court erred in curtailing the defense efforts to show a continuing relationship between Kathy and Petitioner after the shooting.  The appellate court held that there was not an objection to the trial court's ruling to preserve the issue for appeal.  Petitioner faults trial counsel for this, but (1) a reasonable attorney could have believed the error was preserved by the lengthy argument on the issue in the trial court and (2) there is no prejudice because the appellate court gave alternative reasons that the claim lacked merit.

The appellate court noted that the defense had a thorough and complete opportunity to cross-examine Kathy, the jury was aware of the testimony of Kathy and Petitioner that they were still married at the time of trial and had contact with each other after the shooting, and Petitioner testified that he was the one who attempted to begin divorce proceedings after the shooting.  Thus, the jury was presented with evidence regarding the nature of their relationship after the shooting and could draw their own conclusions about the credibility of the witnesses.  State v. Free, 127 So.2d at 967.  Counsel's lack of a contemporaneous objection did not prejudice the defense because the appellate court would have denied relief on the merits even if the issue was preserved.  Habeas relief is not available with respect to the state court's denial of this Strickland claim.

### H.  Dr. James Thompson

Petitioner saw Dr. James Thompson a couple of months after the shooting for complaints that he was depressed and not sleeping.  Dr. Thompson wrote that Petitioner

said the reason for the visit was "Recently in jail for killing stepson. Describes night of shooting—he thought he was very small and that stepson was very large and had many arms." Thompson wrote that Petitioner was to see a psychiatrist later that day, and he "sent note with concerns about recent psychosis." Thompson also wrote: "Symptoms suggestive of psychosis on night of shooting." Tr. 2003-05. Petitioner argues that counsel were deficient for not calling Dr. Thompson as a witness.

"Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain." Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010). A petitioner who makes such a claim must demonstrate prejudice by demonstrating that the witness was available to testify and would have done so, setting out the content of the proposed testimony, and showing that the testimony would have been favorable to a particular defense. Id., citing Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009). See also Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000) (reversing grant of habeas relief for lack of such a showing).

Petitioner did not present an affidavit from Dr. Thompson or other evidence that Thompson was available and willing to testify that Petitioner was affected by psychosis or other mental issue the night of the shooting. There is also no corroboration in the trial evidence that Petitioner was suffering from psychosis or visual hallucinations. Petitioner testified at length about the events of that evening, and he never claimed to have seen such things. There was no testimony from any witness that Petitioner had mental health problems at any time. Also, the defense did not urge an insanity defense that might have

benefitted from Thomson's testimony.  The state court's denial of this claim was a reasonable application of Strickland to the record, so Petitioner has not demonstrated entitlement to habeas relief.

### I.  Motion for New Trial

Petitioner argues that defense counsel were ineffective for not including in their motion for new trial an argument based on ADA Cox's misconduct.  There is no indication that the state court would have granted relief if such an argument had been presented.  Petitioner later raised the claims of prosecutorial misconduct in his post-conviction application, and they were denied at all levels of the state court system.  Failure of counsel to file futile motions is not ineffective assistance.  Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002); Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994).

### J.  Prejudice Assessment

Finally, Petitioner argues that trial counsel's several alleged shortcomings, when considered cumulatively, prejudiced his defense enough to warrant a new trial.  A similar cumulative prejudice argument was addressed and rejected in Hill v. Davis, 781 Fed. App'x 277 (5th Cir. 2019).

Hill noted that a federal court may not grant habeas relief unless the state court decision runs afoul of clearly established federal law "as determined by the Supreme Court."  28 U.S.C. § 2254(d).  The petitioner did not point to any Supreme Court precedent that instructs lower courts to employ a cumulative prejudice analysis, so there was no basis for habeas relief.  The same is true here.  See also Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008) ("[T]he district court noted that '[m]eritless claims or claims that are

not prejudicial cannot be cumulated, regardless of the total number raised'. We agree.");
and Brumfield v. Vannoy, 2022 WL 2712386, *14 (E.D. La. 2022) (collecting cases that
have rejected the cumulative prejudice argument). Accordingly, Petitioner cannot
demonstrate that the Louisiana Supreme Court's denial of his Strickland claims on the
merits was an objectively unreasonable application of Strickland or any other clearly
established Supreme Court precedent.

**Ineffective Assistance of Appellate Counsel**

Petitioner argues that he was denied effective assistance of appellate counsel. The
Sixth Amendment does not require appellate counsel to raise every available non-frivolous
ground of appeal. It requires only that counsel perform in a reasonably effective manner.
Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998), citing Evitts v. Lucey, 105 S.Ct.
830 (1985). When a petitioner claims that counsel omitted an issue that should have been
argued, the petitioner must show that had the issue been raised there was a reasonable
probability that he would have won on appeal. Smith v. Robbins, 120 S.Ct. 746, 764
(2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).

Petitioner's first attack on appellate counsel is not that she omitted an issue but that
she raised too many. He states that counsel raised 20 assignments of error, but many of
them were incredibly weak because the trial court was correct in its rulings on those issues
or the claims that were not preserved for appeal. It is sound appellate strategy to focus on
stronger arguments and eliminate those with little likelihood of success. "Experienced
advocates since time beyond memory have emphasized the importance of winnowing out
weaker arguments on appeal and focusing on one central issue if possible, or at most on a

few key issues." <u>Jones v. Barnes</u>, 103 S. Ct. 3308, 3313 (1983).  Petitioner certainly did not follow that advice when he drafted his shotgun-approach habeas petition, but he faults appellate counsel for doing the same thing.  In any event, there is no clearly established Supreme Court holding that would require a new trial on the grounds that appellate counsel raised too many issues.  And there is no reason to believe that Petitioner would have prevailed on appeal if counsel had focused on fewer issues.  Judge Garrett's detailed opinion for the appellate court dutifully addressed each of the several issues.

Petitioner next argues that appellate counsel's proliferation of errors caused her to overlook arguing that the defense was prejudiced when the trial court denied a motion for continuance based on the State's late disclosure of a couple of photographs during jury selection.  The appellate court fully discussed the denial of a continuance claim and noted that, even when an abuse of the trial court's discretion is shown, reversal is not ordered absent a showing of specific prejudice.  Counsel may not have argued prejudice, but the court went on to say that there was none because the photos were self-explanatory photos of the mobile home, defense counsel had adequate time to review the photos, and the photos were admitted at trial without objection.  The defense also made a late tender of some photos at about the same time.  On that record, "there is no showing of any prejudice in connection with the denial of the motion for continuance." <u>State v. Free</u>, 127 So.3d at 967-68.  Given that assessment, there is no basis to believe that the appellate court would have reversed the verdict if appellate counsel had specifically argued prejudice.

Petitioner complains that appellate counsel listed two assignments of error concerning prosecutorial misconduct but did not make sufficient argument in support of

them.  The appellate court considered the assignments and noted that the brief presented
essentially no argument about how the questions pointed to by the appellant were unfairly
prejudicial or why they should have been interrupted by the trial judge.  The court observed
that such prosecutorial arguments and remarks were ordinarily tempered by the good sense
and fair-mindedness of the jury and found the assignments without merit.  State v. Free,
127 So.3d at 976.  The prosecutorial misconduct arguments were presented in greater detail
in the later post-conviction application, and they were rejected on the merits.  Thus, there
is no likelihood that a more fulsome argument on appeal would have resulted in reversal.

Petitioner argues that appellate counsel did not adequately argue the insufficient
evidence claim by demonstrating that Kathy's testimony was filled with internal
contradictions and conflicts with the physical evidence.  The appellate court devoted
several pages to an examination of the trial evidence and whether it was sufficient to
support the conviction and overcome the plea of self-defense.  State v. Free, 127 So.3d at
960-65.  To the extent the appellate court did not consider the type of arguments Petitioner
thinks should have been briefed, this court has considered them in the course of the several
habeas claims and finds them exaggerated, unsupported by the record, or otherwise lacking.
There is scant possibility that any appellate lawyer could have overturned the verdict based
on a sufficiency of the evidence challenge, given the prosecution-friendly standard of
Jackson v. Virginia, 99 S.Ct. 2781 (1979) that requires viewing the evidence in the light
most favorable to the prosecution and upholding the verdict if any rational trier of fact
could have found the essential elements of the crime proven beyond a reasonable doubt.
There is no basis for habeas relief on this claim.

**Unanimous Verdict Requirement**

At the time of the trial, Louisiana law allowed a verdict in a second-degree murder trial if 10 of 12 jurors agreed.  Petitioner was convicted by a vote of 10-2.  His conviction became final in 2014 when the Supreme Court of Louisiana denied a writ application at the end of the direct appeal process.  Six years later, the Supreme Court held in Ramos v. Louisiana, 140 S.Ct. 1390 (2020) that the Sixth Amendment, as applied to the states under the Fourteenth Amendment, requires a unanimous jury verdict to convict a defendant of a serious criminal offense.  The next year, the Court held that Ramos announced a new rule of criminal procedure that does not apply retroactively on federal collateral review.  Edwards v. Vannoy, 141 S.Ct. 1547, 1562 (2021).  Thus, Ramos does not provide a basis for relief in this habeas proceeding.  Smith v. Hooper, 2023 WL 4462088 (5th Cir. 2023).

Petitioner's claims four, five, and six assert various arguments relating to his non-unanimous jury verdict.  The state argues that (1) Petitioner did not exhaust his state court remedies with respect to the claims because he did not present them to the Supreme Court of Louisiana and (2) the claims lack merit.  The court need not address exhaustion because a habeas application may be denied on the merits notwithstanding a failure of the applicant to exhaust state court remedies.  28 U.S.C. 2254(b)(2).  The claims all lack merit considering the Edwards decision, which issued after this petition was filed.  Petitioner is not entitled to relief on those final claims.

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.   See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14)

days from the date of this Report and Recommendation, file a memorandum that sets forth

arguments on whether a certificate of appealability should issue.

       THUS DONE AND SIGNED in Shreveport, Louisiana, this 30th day of August,

2023.

                                 Mark L. Hornsby
                                 U.S. Magistrate Judge